CARY M. HUNT ET AL., APPELLEE, V. VALENTINE
LIPP ET AL., APPELLANTS.

[FILED SEPTEMBER 30, 1890.]

1. The evidence examined, and *held*, to sustain the findings and judgment of the district court.

2. Real Estate : CONTRACT FOR SALE: OCCUPATION: STATUTE OF FRAUDS. The deposit of building material, of from ten to fifty wagon loads of sand, from 2,000 to 10,000 feet of lumber, and from 2,000 to 10,000 bricks, with a tool and lime house, or box ten feet square, upon an otherwise unoccupied and vacant town lot, from which portions of such material were from time to time hauled away and used by the owner in buildings then being built or repaired by him on other lots, the balance remaining on the lot, all with the knowledge and implied consent of the owner of the title to the lot, *held*, not to point unmistakably to a contract between the owner of the lot and the owner of the building material, and tool box, for the sale of the lot, nor to constitute such a possession of the lot by the owner of the building material as amounted to a part performance of a verbal contract for the sale of the lot by the former to the latter, nor such as would take it out of the operation of the statute of frauds.

3. ———— : ———— : PURCHASER: NOTICE: The same *held*, not to constitute notice to a subsequent purchaser of the lot.

APPEAL from the district court for Douglas county. Heard below before WAKELEY, J.

*B. G. Burbank, John L. Webster,* and *Winfield S. Strawn,* for appellants, cited, as to possession and notice : *Giles v. Ortman,* 11 Kan., 63; *Cartwright v. McFadden,* 24 Id., 662; *O'Callaghan v. Booth,* 6 Cal., 63 ; *Brumagim v. Bradshaw,* 39 Id., 24; *Kerr v. Hitt,* 75 Ill., 60; *McLean v. Farden,* 61 Id., 108–9 ; *Brooks v. Bruyn,* 18 Id., 542; *Webbs v. Hynes,* 9 B. Mon. [Ky.], 388; *Bartlett v. Draper,* 23 Mo., 407; *Miller v. Northup,* 49 Id., 397; *King v. St. Louis Gas Co.,* 34 Id., 34; *Morrison v. Kelly,* 22 Ill., 610 [74 Am.

Dec., 169]; *Scott v. Delany*, 87 Id., 146 ; *Copeland v. Murphey*, 2 Coldwell [Tenn.], 64; *Kirder v. Lafferty*, 1 Whart. [Pa.], 302; *Ewing v. Burnet*, 11 Pet. [U. S.], 41 ; *Gill v. Newell*, 13 Minn., 430 ; *Machin v. Goertner*, 14 Wend. [N. Y.], 239; *Booth v. Small*, 25 Ia., 181 ; *Clement v. Perry*, 34 Id., 564 ; *Spitler v. Scofield*, 43 Id., 572 ; *Nolan v. Grant*, 51 Id., 519 ; *Colvin v. McCune*, 39 Id., 502 ; *Langworth v. Myers*, 4 Id., 18 ; *Barrett v. Love*, 48 Id., 103 ; *Ellicott v. Pearl*, 10 Pet. [U. S.], 442 ; *Moss v. Scott*, 2 Dana [Ky.], 275 ; *Close v. Samm*, 27 Ia., 510 ; *Fletcher v. Fuller*, 120 U. S., 553 ; *Watkins v. Holman*, 16 Pet. [U. S.], 54 ; *Jackson v. Stoetzel*, 87 Pa. St., 302. As to part performance: *Johnson v. Gresham*, 5 Dana [Ky.], 542 ; *Caldwell v. Carrington's Heirs*, 9 Pet. [U. S.], 103 ; *Jones v. Pease*, 21 Wis., 644; *Smith v. Finch*, 8 Id., 99 ; *Baldwin v. Thompson*, 15 Ia., 504; *Green v. Jones*, 76 Me., 563 ; *Lester v. Foxcroft*, 1 Coll's Parl. Cas. [Eng.], 108 ; *Morphett v. Jones*, 1 Swanst. [Eng.], 181 ; *Bassler v. Niesly*, 1 S. & R. [Pa.], 431*, 472*; *Ayer v. Hawkes*, 11 N. H., 148 ; *Harris v. Knickerbacker*, 5 Wend. [N. Y.], 638 ; *Tilton v. Tilton*, 9 N. H., 385 ; *Brewer v. Brewer*, 19 Ala., 488 ; *Cumming v. Gill*, 6 Id., 562 ; *Johnston v. Glancy*, 4 Blackf. [Ind.], 98 ; *Eaton v. Whitaker*, 18 Conn., 222 ; *Wilbur v. Paine*, 1 O., 251 ; *Fitzsimmons v. Allen's Admrs.*, 39 Ill., 440 ; *Letcher v. Cosby*, 2 A. K. Marsh. [Ky.], 106 ; *Abbott v. Draper*, 4 Denio [N. Y.], 51 ; *Underhill v. Williams*, 7 Blackf. [Ind.], 125 ; *Tibbs v. Barker*, 1 Id., 58 ; *Wharton v. Stoutenburgh*, 35 N. J. Eq., 266 ; *Sterling v. Klepsattle*, 24 Ind., 94; *Bechtel v. Cone*, 52 Md., 707; *Dugan v. Gittings*, 3 Gill [Md.], 157; *Beardsley v. Dunley*, 69 N. Y., 577; *Danforth v. Laney*, 28 Ala., 276 ; *Green v. Finin*, 35 Conn., 181; *Green v. Richards*, 23 N. J. Eq., 32 ; *Schenck v. Cuttrell*, 1 Zab. [N. J.], 7 ; *Ashmore v. Evans*, 3 Stock. [N. J.], 151 ; *Stark v. Wilder*, 36 Vt., 752 ; *Lipp v. Hunt*, 25 Neb., 91 ; *Jamison v. Dimock*, 95 Pa. St., 52 ; *Pugh v. Good*, 3 Watts & Serg. 56 ; *Bigelow v. Armes*, 108

U. S., 10; Hillard, Vendors [2d Ed.], pp. 140–1; Brown, Statute of Frauds, secs., 465, 467, 469; Bigelow, Fraud, p. 386; Kerr, Fraud and Mistake, p. 135; 4 Kent [12th Ed.], p. 451; 1 Story, Eq. Jur. [12th Ed.], secs. 761, 763; 3 Parsons, Contracts [6th Ed.], p. 395; 2 Chitty, Contracts [11th Am. Ed.], 1451.

*Charles Offutt*, for appellant Hunt, cited, as to part performance: *Morgan v. Bergen*, 3 Neb., 209; *Poland v. O'Connor*, 1 Id., 50; *Baker v. Wiswell*, 17 Id., 52; 3 Washb., Real Prop. [5th Ed.], 248; *Hill v. Meyers*, 43 Pa. St., 170–3; *Moyer's Appeal*, 105 Pa. St., 432; *Glass v. Hulbert*, 102 Mass., 33–4; *Ash v. Daggy*, 6 Porter [Ind.], 259; *Wack v. Sorber*, 2 Whart. [Pa.], 387.

*G. W. Ambrose*, for appellees Rocheford and Gould.

Cobb, Ch. J.

This action was brought by the plaintiffs and appellees to quiet their title to the original lot No. 7, of block No. 77, in the town of South Omaha, against the claim of the defendants and appellants.

The plaintiffs alleged, in the court below, "that on April 2, 1886, Alexander H. Swan and his associates, as trustees of the town of South Omaha, being seized in fee simple of said original lot No. 7, deeded the same to the plaintiff, Cary M. Hunt, by deed of general warranty, duly recorded April 3, 1886.

"II. That on September 24, 1887, the plaintiff Hunt, having become possessed of the fee of the adjoining lot, No. 6 of said block No. 77, subdivided the lots Nos. 6 and 7 as a subdivision of said block, by the name of C. M. Hunt's Subdivision, into lots numbered from one to seven, inclusive, a plat of which was placed of record September 27, 1887, and is referred to as Exhibit A.

"III. That on February 1, 1887, lot No. 6 of the sub-

division was conveyed by plaintiff Hunt to plaintiffs William Rocheford and Frank P. Gould, of record March 8, 1888; and on September 24, 1887, lot No. 7 of the subdivision was conveyed to plaintiff Math. Evetz, of record October 11, 1887.

"IV. That the plaintiffs claim title to, and are in open and notorious possession of, all of said original lot 7 of block 77, in South Omaha, under the conveyances mentioned, specifically as follows: The plaintiff Hunt, of the east 103 feet, being the south 60 feet of lots 1, 2, 3, 4, and 5, of said subdivision; the plaintiffs Rocheford and Gould, of the east half of the west 44 feet of the original lot 7, being the south 60 feet of lot 6 of the subdivision; and the plaintiff Evetz, the west 22 feet of the original lot 7, being the south 60 feet of lot No. 7 of the subdivision; that by reason of the respective and contiguous holdings of the plaintiffs in the original lot No. 7, they have a common interest in this action and are equally affected by the acts of the defendants hereinafter complained of.

" V. That the defendants Charles Corbett and Valentine Lipp claim to be, and pretend that they are, the owners and are entitled to the possession of the original lot 7 by a contract of Lipp with one Pivonka, under an alleged contract for the purchase of said lot by the trustees of South Omaha with Pivonka, and by him alleged to have been assigned to Lipp; and that Corbett claims under a deed from Lipp to him, as trustee, of record January 6, 1888; that defendants Holmes and Smith claim an interest or title to the original lot 7 under a mechanic's lien for material and labor supplied on the premises, of record October 23, 1886.

" VI. That the alleged claims of defendants are entirely false ; that the contract of the trustees of South Omaha to Pivonka was never assigned to Lipp, and that at the date of Lipp's conveyance to Corbett he had no interest, right, or title in the contract or to the premises, and that any ma-

terial used by him upon the premises was wrongfully used, and without the consent or knowledge of the plaintiffs, or either of them; but that said contract with Pivonka was duly assigned, transferred, and delivered to the plaintiff Hunt, and in compliance with its terms the trustees made to him the deed heretofore described for said lot 7, in block 77, of the town of South Omaha.

"The plaintiffs allege that they are the absolute owners of said lot, but that the defendants' pretended claim casts a cloud upon their title, and ask that the defendants, and each of them, be enjoined from asserting or claiming any interest or title in or to the said premises, or any part thereof, and pray for general relief."

EXHIBIT A.

C. M. Hunt's Subdivision of Lots 6 and 7 of Block 77, of South Omaha.

The defendants Lipp and Corbett answered, admitting "the title to the premises, lot 7, in block 77, in the trustees of South Omaha, and their deed to Hunt, but denied that it conveyed in law the premises to Hunt, or that he had

any interest or title in and to the premises; they admit that he pretended to subdivide lots 6 and 7 into C. M. Hunt's subdivision, but deny that he had any right or authority so to do.

"3. They admit the conveyances of Hunt to Rocheford and Gould, of lot No. 6 of Hunt's subdivision, but deny that it conveyed the absolute fee simple title to any portion of lot No. 7 of block 77, of South Omaha, and admit the conveyance to Evetz, but deny that it conveyed the absolute fee simple title to any portion of lot No. 7 of block 77, of South Omaha.

"4. They deny that the plaintiffs hold any title to or in said premises, or that they are in open and notorious possession of said original lot No. 7 of block 77, except that, claiming to be the owner of said lot on May 26, 1886, the plaintiff Hunt commenced an action of forcible entry and detainer before a justice of the peace of Douglas county, and upon an appeal from the judgment of such justice he obtained a judgment for the possession of the premises, and by a writ of restitution was put in possession, but that the defendant Lipp subsequently appealed said cause to the supreme court of this state, and that the same is now pending and undetermined; that the plaintiffs have no other or different possession than that stated, and that the grantees of Hunt took said conveyances and took possession of the premises with full knowledge of the appeal taken to the supreme court, and are charged with full knowledge of the claims of defendants, and purchased and took possession of the premises at their own risk.

"5. They claim to be the owners and entitled to the possession of the original lot 7, in block 77, and they deny that the plaintiffs, or either of them, are seized of said lot, or any part thereof, or have any title or interest therein, and deny all knowledge of the mechanic's lien of Holmes and Smith.

"6. They allege that on May 6, 1884, Alexander H.

Swan and his associates, as trustees of South Omaha, were the owners of the premises in dispute and on that day sold the same to T. S. Lewis for the sum of $300, by the execution and delivery of a land contract signed by the parties; that by the subsequent assignments the equitable title to the premises vested in Lewis was transferred to and became vested in Frank Pivonka, and that afterwards, about January 15, 1885, Pivonka and defendant Lipp entered into a verbal contract for the sale of the premises to Lipp, who agreed to pay $125 for Pivonka's equitable interest, upon the payment of which Lipp was to have received a formal assignment of the land contract, and such conveyance of the premises.

"7. They allege that Lipp fully paid Pivonka $125 for his equitable interest, and $81.25 additional for the payment due on the contract May 6, 1885, according to its terms, as will be seen by the defendant's Exhibit A; that about February 1, 1885, under this contract and sale, Lipp took peaceable possession of the premises with the knowledge and consent of Pivonka, and has ever since retained possession and control up to the time when Hunt was placed in possession as stated.

"8. That Pivonka, in violation of his contract and in fraud of the rights of Lipp, on October 23, 1885, pretended to sell the premises in controversy to Hunt by an assignment of the land contract purporting to convey the equitable title to Hunt, without having any right, title, or interest to or in said premises.

"9. And that Hunt had notice and full knowledge of Lipp's rights and interest in the premises prior to his alleged purchase.

"10. And the defendants allege that after Hunt had become so possessed of the contract of sale of the trustees of South Omaha to Lewis, he surrendered the same and received a warranty deed for the premises, but it is denied that such deed conveyed any interest, right, or title whatsoever in said premises to Hunt.

"11. The defendants tender into court the sum of $150, with interest and taxes, as in said land contract provided, and set up that the interest of defendant Corbett in the premises is that of a trustee for defendant Lipp, the *cestui que trust*. The defendants ask that the deed from Swan and his associates, as trustees, to Hunt, and the deeds from Hunt to Rocheford and Gould, and the deed from Hunt to Evetz be annulled and set aside, and that the mechanic's lien of Holmes and Smith be set aside, and that the title to the premises be declared to be forever quieted in the defendant Charles Corbett as trustee."

The defendants' Exhibit A is the original land contract, dated May 6, 1884, "between Alexander H. Swan, William A. Paxton, Thomas Swobe, Frank Murphy, Charles W. Hamilton, Peter E. Iler, and James M. Woolworth, trustees, of the first part, and T. S. Lewis, of Omaha, Nebraska, of the second part, for the sale to the party of the second part, of lot 7, in block 77, in South Omaha, Douglas county, Nebraska, for the sum of $300, on which the second party has paid the sum of $75, and agrees to pay to the party of the first part the following sums of principal and interest at the several times named below:

"First payment, 6th May, 1885, $75; interest, $5.25; amount, $80.25; taxes, $1, paid 5–12–'84.

"Second payment, 6th May, 1886, $75; interest, $10.50.

"Third payment, 6th May, 1887, $75; interest, $15.75."

With various provisions and stipulations, by M. A, Upton, assistant secretary; countersigned, Frank Murphy. treasurer; T. S. Lewis, purchaser.

### UNDERWRITTEN.

"OMAHA, NEB., November 24, 1884.

"For value received, I hereby assign, transfer, and set over unto Frank Pivonka all my right, title, and interest in and to lot 7, block 77, South Omaha, Neb., as described in within contract.

"Witness: ———.                    ——— ———.

"OMAHA, NEB., October 23, 1885.

"For value received, I hereby assign, transfer, and set over unto C. M. Hunt all my right, title, and interest in and to lot 7, block 77, South Omaha, Neb., as described in within contract                    F. PIVONKA.

"Witness: P. J. TIMMONS."

INDORSEMENT.

·"South Omaha, contract No. 38, lot 7, block 77, to T. S. Lewis.

"Assigned to R. Allen, 5–23–'84.
        "      " S. J. Howell, 6–20–'84.
        "      " R. Allen.
        "      " F. Pivonka, 12–1–'84.
        "      " C. M. Hunt, 10–23–'85.
"Deed issued Cary M. Hunt, 4–3–'86.

"Omaha, Oct. 2.3, 1885.   Consent is hereby given for above transfer, and same entered of record.

                          "M. A. UPTON,
                               "*Asst. Secty.*"

The reply of the plaintiffs admits the execution and the correctness of the land contract set out as Exhibit A to the defendants' answer, but denies all other allegations of defendants' setting up title or equitable interest in the premises under said contract.

There was a trial to the court, a jury being waived, on the 11th day of May, 1889, in which it was first found that the parties hereto agree that the west twenty-five feet of lot seven, in block seventy-seven, in South Omaha, and the same portion of said lot which was, on September 24, 1887, conveyed to the plaintiff Math. Evetz by the plaintiff Cary M. Hunt, has been duly conveyed by all parties hereto, and that the South Omaha National Bank is now invested with all the right and title of all the parties hereto, to the west twenty-five feet of said lot seven, in block seventy-seven, in the city of South Omaha; and the cause

coming on further to be heard on the motion of the plaintiffs Rocheford and Gould to dismiss the action without prejudice as to them, and the court being sufficiently advised thereon, it is ordered and adjudged that the motion be sustained, and that the action be dismissed without prejudice so far as the same affects their rights and interests, or those of either of them; to which the defendants excepted.

On final hearing, upon the petition, answer, reply, and the evidence, the court found that at the commencement of this suit the plaintiff Hunt was in the possession of the disputed premises, and had a legal estate therein, and was entitled to the possession thereof, to-wit: of lots 1, 2, 3, 4, and 5 of C. M. Hunt's subdivision of lots 6 and 7 of block 77, of South Omaha, Nebraska; and that the defendants Lipp and Corbett, and Holmes and Smith, neither of them have any estate or interest in said premises, or any part thereof, and are not entitled to the possession of the same; to which the defendants excepted.

The arguments of counsel in this case are voluminous and exhaustive, and the points presented are numerous, some of which it will not be deemed necessary to discuss. Our opinion will be confined chiefly to the questions considered in the findings of the court below. Upon the trial the court ruled that the burden of proof was upon the defendants.

The defendant Lipp testified, substantially, that he was a builder and contractor, residing in South Omaha for a period of over four years; that he became acquainted with Frank Pivonka in May, 1884, and "was acquainted with the lot in question all the while he was there;" that about the time of Christmas and New Year's, in 1884 and 1885, he asked Pivonka, in his saloon in South Omaha, "where he could find the party, Lewis, who owned the lot, and was told by Pivonka that the man had gone off, and Pivonka went down to Omaha on the next train and hunted up the

man, and bought the lot;" that Pivonka returned and on the next day said to witness, "Now I have bought that lot, and can sell it to you, if you want it;" that witness replied, "Yes, I want to buy that lot." This the witness thinks took place the second day after Christmas, 1884; that witness asked him what he would take for the lot, and he replied that he would take $125 for his interest in it, and that he had paid $100 for it yesterday.

It should be stated that it was not claimed that the purchase of Pivonka was that of the legal title to the lot, which was in the trustees of the South Omaha Company, which throughout the litigation is called the syndicate. These trustees had, on May 6, 1884, sold the lot to T. S. Lewis, as appears from defendants' Exhibit A, set forth, for $300, of which $75 was paid down, and an equal amount, with interest and taxes, was to be paid in three annual installments, and had delivered a land contract, only assignable by the written authority of the trustees, of which time was made the essence of the contract and prompt payment required.

The witness Lipp further testified that, subsequent to the conversation mentioned, Pivonka wanted a well dug upon the hill, and witness offered to sink the well as consideration for the lot, or as a payment on it, and they finally agreed that witness should have ninety cents per foot for digging and bricking up the well; that the same should be applied to the payment of the $125 on the lot, and that, when the well was completed, if it did not amount to the full sum, witness was to pay the balance, and if to more, Pivonka was to pay him the balance, in cash, and that Pivonka was to assign the land contract to witness as soon as he had finished the well; that the well was not finished till June, 1885, and that its depth was within a few inches of ninety feet; that at about the time the well was finished, the witness contracted with Pivonka to build his brick house according to his plans and specifications, the material to be

furnished by witness, for the sum of $1,200; that witness
built the house accordingly, and that at the time of the com-
pletion of the well, in June, 1885, Pivonka was indebted to
the witness on the building contract six or seven hundred
dollars; that afterwards witness entered into another con-
tract with Pivonka to erect a second building, for a barbei
shop, for the sum of $300, in June, 1885, which was com-
pleted according to contract. He further testified that at
the time the well was finished and the house under roof,
some of his laborers had threatened to file their mechanics'
liens against the house, and the witness having asked Pi-
vonka about the promised assignment, he replied, " Wait till
you get squared up with these carpenters and it will be all
right," and that was all that was then said about it; that
later, in August, Pivonka called the witness's attention "to
come up and settle with him," and that they had a count of
tickets and orders and so on, and Pivonka said then that
there had been a lien filed by the carpenters for about
$500, or something like it, and if witness would see that
paid and get it straightened out he would assign the con-
tract to witness, and not till then ; that there was nothing
more said between them, and the next thing witness heard
about the contract was that Pivonka had sold the lot and
assigned the contract to Hunt.

With the remark that this testimony of Lipp is to some
extent corroborated by that of other witnesses, I turn to
the testimony of Frank Pivonka, a witness for the plaint-
iffs.   The witness testified that in 1884 he learned that the
lot in controversy was for sale, it taking him two or three
days to find out the owner, and then bought the lot; that
three or four days afterwards Lipp said to witness that if he
could buy that lot he would go ahead and build a three-
story brick house and basement, and commence from
Twenty-fifth street and build all over; that witness replied
to him, " that is all right; if you will do that, I will sell it
to you."   That the next day Lipp brought to witness a

plan for a house he proposed to build on the lot, and witness said to him, if he would put up such a building that he would let him have the lot for $25 in addition to the $325 witness had paid for it; that he would not sell it to him for speculative purposes, because he could hold it himself. That subsequently he inquired of Lipp how much he would charge to dig and brick up a well on Twenty-fourth street, and that Lipp replied that in the winter season he had nothing to do, and would charge him ninety cents per foot, and witness replied, " Go ahead and dig the well, and when you get through, if you buy the lot you may pay the balance, or I will pay you the balance, either way, because (said the witness) he was owing me." Lipp then dug the well, and when dug he got that much money out, and went on and built the brick house. Witness gave him money to buy the lumber, and witness bought the brick and paid the men employed, except those two men, and there was nothing said about the lot; neither of us said anything about the lot at that time; witness made the May payment, 1885, on the lot; that he knew that Lipp had no money.

Upon this evidence, and that corroborating defendants' evidence, as stated, the trial court found that it did not establish the sale of the lot by Pivonka to Lipp, at most, with that degree of certainty and clearness necessary to the foundation of an action to compel specific performance, or to enforce a parol agreement for the conveyance of real estate.

In reviewing that finding I am not prepared to say that it is error, for the evidence affirmative of and adverse to the contract is sharply conflicting; and, as has been often decided by all the courts, in cases of conflicting evidence, except where the preponderance is greatly against it, the findings of a trial court on a question of fact will be sustained in a court of review; and, although the trial court admitted the probability of Lipp's version of the

31

controversy as more nearly the truth than that of Pivonka's, yet it is with the findings of the court we have to do rather than with its reasons therefor. But in justice to that court it is to be said that its findings on the proof of contract were based more upon the lack of evidence of payment than of the contract itself, and its reasoning being satisfactory, its line of argument is adopted.

The well dug and completed for Pivonka was undertaken in the winter season and completed in the following June. According to Lipp's testimony it was ninety feet deep, and at ninety cents per foot amounted to $81, and according to his evidence he was to pay in cash the difference between that sum and $125 due on the lot. If the well came to more than $125 Pivonka was to pay that difference to him in cash. Before the well was completed, and before the cost could be known, Lipp contracted with Pivonka to erect a brick house, and made a second contract to erect a barber shop. At least one of these was in process of construction before the completion of the well. In the meantime, before the completion of the well, the payment of $75 principal and $6 of interest and taxes became due to the trustees of South Omaha on the lot; that was shortly before the completion of the well. Lipp testified that Pivonka called his attention to that fact, and asked him what he was going to do about it; to which he replied, " Well, you owe me money; I am putting up this building for you; you pay that and charge it to me." Lipp further says that Pivonka paid it, and included it in a certain receipt taken by him for two hundred and more dollars. This fact Pivonka denies, and Lipp is not directly supported by any corroborative evidence. I agree with the district court in the opinion that this may or may not have been so. We have Lipp's oath in the affirmative and Pivonka's in the negative, and no corroboration of either. It will be seen, in review of Lipp's evidence, that at one time he asked Pivonka to assign the contract of purchase

of the lot to him, and that Pivonka replied, "That some fellows had filed liens on my property and I won't do anything about it till you get rid of these liens, and when you do I will assign you the contract." This fact is denied by Pivonka in express terms, and lacks corroboration from other sources. Pivonka denies that the well was ninety feet deep, but admits that it was seventy-six feet deep only. But upon the theory of Lipp's statement, the amount of the work on the well was $44 less than that he says he was to pay for the lot, and if the deficiency either way was to be paid in cash by the party owing the other, there is no evidence that he paid the balance due. I agree with the district court that if Lipp's testimony be accepted, it fails to prove the payment of the full consideration for the lot, or for the contract therefor. And this is true, even if it be admitted that there was then and is money still due from Pivonka to Lipp on one or both of the building contracts, as the evidence fails to prove an agreement of the parties that the difference in the sum due Lipp for the well and that due Pivonka for the lot should be taken out of the building contracts or either of them.

I have considered the evidence and the arguments of counsel carefully, with a view of determining whether at the close of these transactions there was money due from Pivonka to Lipp which might be presumed to have been retained by the former as covering this balance, without being able to reach such conclusion.

As to the possession by Lipp of the lot in controversy, he testified that in February, or between February and March, 1885, he established the lot for mortar yards and deposited sixty or seventy-five loads of sand there, "at once during the winter;" that a month or two later he hauled 2,000 feet of lumber there, and in June or July had 2,000 brick deposited there, and on August 1 he moved a lime house from Pivonka's brick building down to and upon the lot; that the house was originally fourteen

feet square, and was rebuilt on the lot ten feet square, and was used to keep tools and lime protected and dry. He testified, in answer to question by his counsel, that at and prior to October 23, 1885, the date of sale to Hunt, there was remaining on the lot the sand, the lime house, 12,000 brick, and 5,000 feet of lumber deposited there; "that he moved this property there under the consideration that it was his lot, and his own place of doing business." The testimony of Lipp as to the sand, brick, lumber, and lime, and the tool house upon the lot, and the times the same were placed there is, to some extent, corroborated by that of other witnesses, and is also in material respects contradicted by witnesses, especially by that of Pivonka on cross-examination by defendants' attorney, in his deposition put in evidence on the trial. Taking it altogether, it appears substantially proven that upon the completion of Pivonka's house, in the latter part of the summer or early fall, there were several thousand brick, and a quantity of sand and lumber, left over from the building, which were hauled to and deposited on the lot in question. It also appears that the tool and lime house, having been used for storage at the site of Pivonka's brick house, remained there until objected to by the occupants of the house as an unsightly incumbrance, and was then removed to the lot in litigation, where it was set up in its original shape, reduced to ten feet proportions. When this was done is left in doubt, from the testimony, but I think it may be admitted to have taken place before October 23, 1885.

Sections 3 and 6 of chapter 32, Compiled Statutes, usually called the statute of frauds, provides that "No estate or interest in land other than leases for a term not exceeding one year * * * shall hereafter be created, granted, assigned, or surrendered, or declared unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same.

*     *     *     *     *     *     *

"Sec. 6. Nothing in this chapter contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreements in cases of part performance."

Mr. Pomeroy, in his work on Contracts, at section 107, says: "In a suit to enforce the specific performance of a verbal contract embraced within the statute of frauds, two distinct facts are established by parol evidence—the acts of part performance, and the terms of the agreement itself. According to the theory upon which equity proceeds, in such cases, the part performance must be first proved, in order to fulfill the condition precedent for letting in parol evidence of the agreement; and this is not a mere question of the order of proofs—it involves the very principle of the jurisdiction. As soon as a sufficient part performance is made out, the plaintiff may go on and show the terms of the verbal contract. There are, therefore, two distinct branches of parol evidence, with a distinct fact to be established by each, but proceeding in a fixed order of time, and of antecedent and consequent; not, however, exactly in the order of cause and effect. * * * The true rule is, that the acts of part performance must be such as show that some contract exists between the parties; that they were done in pursuance thereof, and that it is not inconsistent with the one alleged in the pleading. Whenever acts of .part performance are made out, which thus point to a contract, the door is opened, and the plaintiff may introduce additional parol evidence directed immediately to the terms of *the* contract relied upon."

The defendant Lipp, doubtless, sought to prove his possession of the lot for two distinct purposes : first, as a part performance of the contract for its purchase, as set out in the petition ; and, second, such contract of purchase and its part performance, being proved, as notice to the plaintiff of his rights under such contract. Was his proof sufficient for both or either of these purposes? And, first, if the

action were between Lipp and Pivonka would it be sufficient? This possession (or the evidence of it), as we have seen, consisted in the deposit of building material and tools thereon. This material was not intended to be used in the construction of a building on the lot, but to be taken away, and was, in fact, most or all of it taken away to other parts of the town where defendant had use for it, and used in the construction or reparation of buildings on other lots. Doubtless its position on the lot indicated the true purpose for which it was deposited there.

The author above cited, in the next succeeding section, says: "He [the defendant] must first prove acts done by himself, or on his behalf, which point unmistakably to a contract between himself and the defendant [Pivonka] which cannot, in the ordinary course of human conduct, be accounted for in any other manner than as having been done in pursuance of a contract, and which would not have been done without an existing contract."

It cannot be said that the placing, or storing, of these building materials and tools upon this lot by Lipp pointed unmistakably, or at all, to a contract by the owner for the sale of the lot to Lipp. On the contrary, it pointed as well to that permissive use of the lot for temporary and convenient purposes, not amounting to permanent improvement or use, which the owners of unused lots or parcels of land in this country generally allow to their neighbors. But after all, this branch of the discussion leads us to this: Did the placing of these things on the lot amount to the taking of the exclusive possession of the lot by Lipp? and this I think is the true test. It is worthy of note that there is no evidence that Lipp himself was ever actually on the lot, except, possibly, at one time when, as claimed by Lipp, and denied by Pivonka, they two, with three other men, walked out from Pivonka's saloon and looked at the lot. There was nothing to indicate to whom the building material, or tool house, or box belonged;

and as none of the material ever was, or was designed to be, built into permanent improvements, it is presumable that there was nothing in their position, or appearance, as placed and situated upon the lot, to indicate the intention of anybody so to use them ; and hence I conclude that the mere ownership of these materials deposited upon the lot did not amount to the exclusive possession of the lot, within the meaning of the law. But if it be granted, for the sake of the argument, that Lipp was in the possession of the lot, what follows? First, according to the rule laid down by Pomeroy, in the section above cited, the proof of possession or other act of part performance of the contract is necessary as a condition precedent to let in evidence of a verbal contract under and in pursuance of which such part performance was made, and to which it must be exclusively referable. And, as between the original parties to the contract, that is, I think, the sole office of the proof of possession. But, as between a party claiming land under a verbal contract of sale and a subsequent purchaser, the possession of the land by such claimant, at the time of such subsequent purchase, is notice to such subsequent purchaser of the verbal contract. In order to perform this latter office such possession must be visible, open, and exclusive.

I know of no case, nor has any been cited, in which the mere deposit of building material or other chattels upon land has been held to be possession, or evidence of possession, or of part performance of a verbal contract for the sale of land, in view of the statute of frauds. In our early case, *Poland v. O'Connor*, 1 Neb., 50, it· is said: "To take such a case out of the statute, the possession of the vendee must be by acts clear, certain, and definite in their object, and having reference to the contract. * * * Using a lot otherwise vacant and adjoining the vendee's warehouse for storing lumber, wagons, and like articles for himself, his firm, and others who have placed the same in his hands for sale on commission, is not such possession as

will take the case out of the statute." In the later case of of *Baker v. Wiswell*, 17 Id., 52, it is said : "The acts of part performance that take the case out of the statute are actual possession and the construction of valuable improvements, or perhaps, in some cases, as where the land was wild, cultivation." These cases, so far as they were intended to go, doubtless, correctly express the law.

It is not deemed necessary to discuss the question as to whether the payment of a part or the whole of the purchase price is sufficient to take a verbal contract for the sale of land out of the operation of the statute of frauds. As we have seen, there is no sufficient evidence of payment in the case before us. Lipp claims that he paid the agreed price for the lot, partly by digging and bricking up a well for Pivonka, and partly by the application of money due him from Pivonka for the erection of a brick dwelling house. This payment and application of money is denied by Pivonka. Upon this evidence the trial court found against Lipp, and I am unable to say that such finding was wrong. Upon the whole case, there is a lack of clear, satisfactory evidence of the fact and terms of the verbal contract, as set out in the petition, as well as of its part performance, either by the taking of the possession of the lot by Lipp pursuant to such contract, or of either whole or part payment of the contract price. It is therefore deemed unnecessary to discuss the questions presented as to the effect of proof of possession, or of payment in whole or in part when relied on as part performance of a verbal contract of sale; nor that of the right of the holder of one of two equitable titles to buy in the outstanding legal title and thereby cut off the equity of his opponent.

I have examined the cases of *Lipp v. Hunt*, 25 Neb., 91, and of *Same v. Same*, 29 Neb., 256, and find nothing in either inconsistent with the above.

The judgment of the district court is

AFFIRMED.

THE other judges concur.